IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICK JAYSON REENERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:23-cv-00401 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| MICHELE LANDRY JOUVENCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Pending before the Court is a "Motion to Dismiss" (Doc. No. 107, "Motion") filed by Michele Landry Jouvence ("Defendant Michele Jouvence") and Pascal Claude Jouvence ("Defendant Pascal Jouvence," and collectively with Defendant Michele Jouvence, "Defendants").[1] Via the Motion, Defendants seek to dismiss the "Fifth Amended Complaint" (Doc. No. 106, "Complaint"), of Plaintiff, Patrick Jayson Reeners. Defendants have filed an opening brief (Doc. No. 108, "Opening Brief") in support of the Motion. Plaintiff has filed a response (Doc. No. 109, "Response") in opposition to the Motion, and Defendants have filed a reply (Doc. No. 110, "Reply"), in further support of the Motion.

---

[1] The Court notes that Defendant Pascal Jouvence and Defendant Michele Jouvence are not the only two defendants to have ever been party to this action. Plaintiff initially brought claims against Mary Guneueg, Randy Lucas, and various John and Jane Doe individuals and entities (collectively, "Terminated Defendants"), in addition to the claims Plaintiff brought (and continues to bring) against Defendant Pascal Jouvence and Defendant Michelle Jouvence. Ultimately, the Terminated Defendants were terminated from this suit either via Rule 21 (Doc. No. 103) or through the filing of Plaintiff's Fifth Amended Complaint (Doc. No. 106). As also relevant here, via the Fifth Amended Complaint, Plaintiff brings claims only against Defendant Pascal Jouvence and Defendant Michele Jouvence, and so the Court will refer to them collectively as "Defendants" even though there were other defendants (the Terminated Defendants) previously named in this action who have since been terminated.

For the reasons described herein, the Court will **GRANT** the Motion.

<u>ALLEGED FACTS</u>[2]

*1. The Parties*[3]

Plaintiff is "an adult resident of Sumner County, Tennessee," (Doc. No. 106 at ¶ 2), and "a 51-year-old self-described 'activist' who devotes much of his time to attempting to make his community a better place through political expression." (*Id.* at ¶ 6).

Both Defendants are also adult residents of Sumner County, Tennessee. (*Id.* at ¶¶ 3-4). Defendant Pascal Jouvence is (as of the time of the filing of the Complaint) an "elected representative on the Gallatin, Tennessee City Council" (*id.* at ¶ 4)—specifically holding Gallatin, Tennessee's Alderman District 3 City Council seat[4] (*id.* at ¶¶ 12-13)—although, as explained in a footnote below, he did not hold this position at the time the events underlying the Complaint took place.

---

[2] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

The Court at times quotes from the Complaint herein. For clarity, the Court notes that unless indicated otherwise, as for example, by the use of single quotation marks nested within a portion of the Complaint quoted using double quotation marks, it is quoting the Complaint and not directly quoting some statement (made during the underlying alleged events at issue) that the Complaint quoted or paraphrased.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

[4] The Court notes that Gallatin, Tennessee is in, and is indeed the county seat of, Sumner County, Tennessee.

## 2. *Factual Background*

"On November 8, 2022, an election was held in Tennessee," (Doc. No. 106 at ¶ 11), and "one of the seats at issue in the election was Gallatin, Tennessee's Alderman District 3 [C]ity [C]ouncil seat." (*Id.* at ¶ 12). Defendant Pascal Jouvence "ran for, and ultimately won, the District 3 Alderman seat." (*Id.* at ¶ 13). Plaintiff opposed Defendant Pascal Jouvence's campaign. (*Id.* at ¶ 15).

To that end, in August 2022, Plaintiff "created several political signs depicting the word 'Pascal' with a circle around it and a line running through it as a way of expressing his opposition to [Defendant Pascal Jouvence's] candidacy." (*Id.* at ¶ 16). Plaintiff subsequently placed these signs near city hall (*id.* at ¶ 17), but Defendant Michele Jouvence took the signs down and "disposed of them." (*Id.* at ¶ 18). On October 1, 2022, Plaintiff then "prepared two additional political signs to be displayed at the Fall Square Fest." (*Id.* at ¶ 19).[5] "One of the signs read 'Pascal the Deceiver', while the other read 'Pascal = Liar.'" (*Id.* at ¶ 20). Plaintiff put his signs up at the Fall Square Fest, "putting the 'Deceiver' sign on the wall of a brick building and the 'Liar' sign between two vendors, after getting their consent." (*Id.* at ¶ 21). However, Defendant Pascal Jouvence, Defendant Michele Jouvence, and an unidentified woman "happened upon the Fall Fest scene." (*Id.* at ¶ 22). The unidentified woman took[6] the "'Deceiver' sign from the brick building." (*Id.*). Defendant Michele Jouvence also "attempted to persuade the vendors to take [the] 'Liar'

---

[5] Plaintiff does not specify what the Fall Square Fest is, but the Court assumes that it must have been a sort of annual fall festival in Gallatin, Tennessee.

[6] The Court accepts as true the allegation that the unidentified woman took the sign. Plaintiff refers to this taking essentially as a theft (a stealing). (Doc. No. 106 at ¶ 22) (alleging that the unidentified woman "stole" the sign). To the extent that this allegation thus portrays the taking, it amounts to a mere verbal characterization and perhaps also a legal conclusion and therefore is not accepted as true. When describing Plaintiff's allegations, the Court uses variations of the word "taking" where Plaintiff has used words like "theft" or "stealing" *and* the Court is treating as true the allegations of taking.

sign down," while Defendant Pascal Jouvence "threatened [to] call the police on [Plaintiff] if he did not leave the area, which [Plaintiff] eventually did out of fear." (*Id.*). Plaintiff later reported the taking "of his political signs to the Gallatin Police Department [hereinafter, "GPD"] – however, the police took no action to punish the [Defendants] . . . or otherwise stop [Defendants] from relying on [allegedly] criminal methods to [allegedly] suppress [Plaintiff's] political speech." (*Id.* at ¶ 23).[7]

As election day neared, on "October 19, 2022, at approximately 4 pm, [Plaintiff] positioned himself with an anti-Pascal sign at a private property next to a polling place during early voting hours, expressing his opposition to [Defendant Pascal Jouvence's] candidacy." (*Id.* at ¶ 24). Defendant Pascal Jouvence, while driving an SUV, approached Plaintiff and blocked Plaintiff and Plaintiff's sign "from being viewed from the perspective of the polling place." (*Id.* at ¶ 25). Defendant Michele Jouvence filmed this encounter. (*Id.* at ¶ 26). Although Plaintiff "repositioned himself several times in order to make his sign viewable from the polling place," Defendant Pascal Jouvence continuously "repositioned his SUV to block [Plaintiff] from view." (*Id.* at ¶ 27). As Plaintiff continued to try to reposition himself, Defendant Pascal Jouvence "aggressively drove up to [Plaintiff] as if he was going to run him over, and revved his engine several times." (*Id.* at ¶ 28). "In fear for his life, [Plaintiff] fled, went home, and called the police." (*Id.* at ¶ 29).[8] "[GPD] patrol officers responded to [Plaintiff's] call, and took his statement. [Plaintiff] explicitly told them that

---

[7] Consistent with a footnote above, the Court here uses the term "alleged" to refer to these acts because the statements that someone "stole" a sign or otherwise "suppressed" Plaintiff's speech—if intended in a legal sense—are legal conclusions. As such, they are not entitled to an assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[8] Based on the entire content of the Complaint (notably in paragraph 41, where Plaintiff refers specifically to the GPD) as well as the briefing on the Motion (where the parties focus extensively on the GPD), the Court understands that this is a reference to the GPD.

he was in fear for his life when [Defendant Pascal Jouvence] drove up on him as if he was going to run him over." (*Id.* at ¶ 30). Plaintiff also gave the GPD video evidence of the October 19 encounter. (*Id.* at ¶ 31).[9]

Subsequently, on October 31, 2022, Plaintiff "sat on his riding lawnmower in a field next to a roadway and spoke out against [Defendant Pascal Jouvence's] candidacy as cars drove by." (*Id.* at ¶ 32). Defendant Michele Jouvence "stood nearby for several minutes, videorecording [Plaintiff]," and subsequently made a phone call. (*Id.* at ¶¶ 33-34). The call was to the GPD Chief of Police, who took the call and discussed Plaintiff with Defendant Michele Jouvence. (*Id.* at ¶¶ 35-36). On the call, Defendant Michele Jouvence stated to the GPD Chief of Police, "'Well I'm calling you because I know you. I guess I could get some other . . .[.]'" (*Id.* at ¶ 37). Subsequently, as noted above, on November 8, 2022, Defendant Pascal Jouvence "won the election for the District 3 Alderman seat." (*Id.* at ¶ 40).

"At some point the [GPD] police detective assigned to [Plaintiff's] assault complaint spoke with [Defendants] about the incident, and [Defendant Michele Jouvence] provided her video – which corroborated [Plaintiff's] allegations – to the police." (*Id.* at ¶ 39).[10] However, "[a]fter

---

[9] A video of this incident may be viewed at https://www.youtube.com/watch?v=vuQGfqnvUXQ. It is unclear to Court whether this is the video that the Complaint mentions Plaintiff gave to the GPD or whether this is the video that the Complaint mentions Defendant Michelle Jouvence recording. Irrespective of what the video does or does not show, the Court will not consider it herein both because it is not necessary to the Court's analysis of the Motion and because although the video (whichever of the two aforementioned videos it is) is referred to in the Complaint, it is not integral to the claims underlying the Complaint. *Hardyway v. McDonough*, No. 3:22-CV-00037, 2022 WL 3702094, at *5 (M.D. Tenn. Aug. 25, 2022) ("As stated above, in a motion to dismiss, the Court may not consider documents outside of the complaint unless they are explicitly referred to and integral to the complaint.").

[10] The Complaint is unclear whether this allegation is referring to the *October 31*, 2022 incident or the *October 19*, 2022 incident. Ultimately whether the Complaint is referring to the October 19 or October 31 incident is irrelevant to the Court's analysis herein, but the Court notes that the reference would seem to be to the October 19 incident, because that incident (in comparison to the October 31 incident) is *far* more conducive to someone claiming it involved an assault.

completing [the] investigation of [Plaintiff's] assault complaint, the [GPD] did not arrest [Defendant Pascal Jouvence] or file any charges against him." (*Id.* at ¶ 41). Plaintiff "spoke with the assigned [GPD] detective, and asked him to explain the decision to not charge [Defendant Pascal Jouvence]. The detective told [Plaintiff] that [Defendant Pascal Jouvence] did not intend to put Plaintiff in fear." (*Id.* at ¶ 42).[11] Plaintiff alleges, in contrast to the GPD detective, that "the information provided by [Plaintiff], corroborated by the video evidence, established that [Defendant Pascal Jouvence] had intentionally driven his SUV up to [Plaintiff] in an aggressive manner and revved his engine multiple times, intimidating [Plaintiff] and frightening him into believing that [Defendant Pascal Jouvence] was about to run over and kill [Plaintiff]. Thus, [Plaintiff alleges,] the [GPD] detective had probable cause for a case of Aggravated Assault

---

[11] It is unclear from the Complaint whether the decision not to charge Defendant Pascal Jouvence—or indeed whether certain other events underlying the Complaint—occurred before or after Defendant Pascal Jouvence's swearing in as a Gallatin City Council member—and thereby his elevation to a (municipal) government official. Whether Defendant Pascal Jouvence was actually serving as a Gallatin City Council member is important for the analysis of Plaintiff's claims, because if he was serving as a Gallatin City Council member at the time the events underlying the Complaint took place, then that *might* (or, conversely, might not) provide another basis (beyond those discussed below) to conclude that Defendant Pascal Jouvence was a state actor for the purposes of a Section 1983 claim. *Cf. Rodriguez v. Kaesman*, No. SACV070780DOCMLGX, 2008 WL 11411477, at *2 (C.D. Cal. June 11, 2008) ("[o]fficials of municipalities and local governments . . . are considered state actors for the purposes of Section 1983"); *Carlisle v. Normand*, No. CV 16-3767, 2018 WL 4587725, at *2 (E.D. La. Sept. 25, 2018) ("Whether an official is elected has no bearing on whether the official is a state actor for purposes of § 1983" and then noting an elected sheriff is "undoubtedly . . . a state actor"), *aff'd sub nom. Carlisle v. Klees*, 786 F. App'x 493 (5th Cir. 2019); *O'Neill v. Hernandez*, No. 08CIV.1689(KMW), 2010 WL 1257512, at *6 (S.D.N.Y. Mar. 25, 2010) (noting that "[a] plaintiff may bring a Section 1983 claim against the municipal entity or a public servant of the entity in his or her official capacity" thereby implying a public servant of a municipal entity, such as a city council member, may be a state actor for the purposes of a Section 1983 claim).

Nevertheless, because the Complaint does not allege, explicitly or implicitly, that Defendant Pascal Jouvence was serving as a member of the Gallatin City Council during any of the events underlying the Complaint, and because Defendants in their Opening Brief assert, without later contradiction by Plaintiff, that Defendant Pascal Jouvence "was not an elected official when the allegations in the Complaint occurred" (Doc. No. 108 at 6), the Court assumes that he had not been sworn in as a member of the Gallatin City Council at the time any of the events underlying the Complaint occurred—including at the time the decision not to charge Defendant Pascal Jouvence was made—thereby meaning that Defendant Pascal Jouvence was not a (municipal) government official at the time the events underlying the Complaint took place and so the Court need not reach the issue of whether a city council member is (or can be) a state actor for the purposes of a Section 1983 claim.

through intentional actions that put [Plaintiff] in fear of an imminent attack with a deadly weapon (a vehicle)." (*Id.*).[12] In sum, Plaintiff alleges that "the decision of the [GPD] to not file charges against [Defendant Pascal Jouvence] was not based on a lack of probable cause – rather, it was based on a combination of [Defendant Pascal Jouvence's] position, the Department's communications with [Defendants], and [Plaintiff's] reputation within the Department." (*Id.* at ¶ 43). At base then, Plaintiff alleges that "[i]n allowing the [Defendants] to [take Plaintiff's] political signs and [allegedly] assault [Plaintiff, allegedly] with impunity, the [GPD] effectively acted in concert with [Defendants] to [allegedly] suppress [Plaintiff's] political speech." (*Id.* at ¶ 45).

### 3. *Plaintiff's Claims and Defendants' Motion*

Plaintiff brings three claims. Count I is comprised of 42 U.S.C § 1983 (hereinafter, "Section 1983") claims for "Suppression of Plaintiff's Political Speech in Violation of the First Amendment to the U.S. Constitution." (*Id.* at 7). Via Count I, Plaintiff alleges that Defendants "suppressed Plaintiff's political speech by stealing his political advocacy signs, intimidating him, and committing a criminal assault against him." (Doc. No. 106 at ¶ 47). Plaintiff further alleges that Defendants were "enabled in their efforts to suppress [Plaintiff's] political speech by the [GPD] who have allowed [Defendants] to suppress [Plaintiff's] political speech through criminal thefts and an assault without fear of consequence." (*Id.* at ¶ 48). Plaintiff also alleges that "[b]ecause of this cooperation with the police, [Defendants] effectively operated under color of state law in taking [Plaintiff's] signs and through [Defendant Pascal Jouvence's] assault [of

---

[12] The Court understands that Plaintiff here is referring to the October 19, 2022 incident when he discusses an alleged assault, because that incident is the only incident that seems to actually involve any sort of (alleged) assault.

Plaintiff]." (*Id.*).[13] Plaintiff also alleges in connection with Count I that "Defendants' suppression of Plaintiff's political speech has been in blatant, reckless, and intentional disregard of Plaintiffs' [sic] rights," (*id.* at ¶ 49), and that "Defendants' illegal suppression of Plaintiff's political speech has caused Plaintiff to suffer a deprivation of liberty and emotional harm." (*Id.* at ¶ 50).

Plaintiff brings, in addition to his federal claims in Count I, two state-law claims. Specifically, Count II is for conversion of property (*id.* at ¶¶ 51-56) and Count III is for assault. (*Id.* at ¶¶ 57-61).[14]

Defendants bring their Motion predominantly on the ground that (according to them) Plaintiff has failed to plausibly allege that the Defendants (as private individuals at the time the events underlying the Complaint occurred) were state actors so as to permit Plaintiff to bring a Section 1983 claim against them. (Doc. No. 108 at 4-12). In their Opening Brief, Defendants argue predominantly that Plaintiff has not plausibly alleged that Defendants were involved in a conspiracy with the GPD, meaning that Defendants cannot qualify as state actors for the purposes of a Section 1983 claim. (*Id.* at 6-9). Via the Motion, Defendants also assert that if Plaintiff's federal claims in Count I are dismissed, "the Court should refuse to exercise supplemental jurisdiction on the remaining state claims." (Doc. No. 107 at 2). Plaintiff argues, by contrast (and

---

[13] As above, the Court understands that Plaintiff here is referring to the October 19, 2022 incident, because that incident is the only incident that seems to actually involve any sort of (alleged) assault.

[14] Curiously, Plaintiff does not allege in the Complaint how the Court may exercise subject-matter jurisdiction over these state-law claims. Instead, he states only that the "Court has federal question jurisdiction over the *federal claims* in this matter pursuant to 28 U.S.C. § 1331." (Doc. No. 106 at ¶ 5) (emphasis added). Nevertheless, the Court assumes that Plaintiff intended for the Court to exercise jurisdiction over these state law claims via supplemental jurisdiction, under 28 U.S.C. § 1367; the alternative, diversity jurisdiction, appears inapplicable because there is no diversity inasmuch as all parties appear to be residents of Tennessee, and thus diversity jurisdiction would not be a proper basis for the Court to exercise jurisdiction over these state law claims. However, for the reasons described below, because the Court ultimately determines that Plaintiff's federal claims in Count I will be dismissed, the Court will also decline to exercise supplemental jurisdiction over Plaintiff's state-law claims and will thus dismiss this entire action in an accompanying order.

unsurprisingly), that Plaintiff need not have pled that Defendants "were in a full-blown civil conspiracy with the GPD leadership in order to be held liable under 42 U.S.C. § 1983." (Doc. No. 109 at 2). Plaintiff instead asserts that the Motion should be denied because the Complaint's allegations "are sufficient to plausibly demonstrate that the [Defendants] received 'significant aid from' the GPD in their efforts to suppress [Plaintiff's] First Amendment rights," so as to qualify Defendants as state actors for purposes of a Section 1983 claim. (Doc. No. 109 at 5). Plaintiff further invokes (as will be explained in more detail below) the so-called "public function" test to argue that Defendants' conduct in taking Plaintiff's political signs was a "public function" and thus attributable to the State for the purposes of a Section 1983 claim. (Doc. No. 109 at 4).

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, i.e., allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

## DISCUSSION

The Court first will review the concept of state actors as it relates to claims under Section 1983 (such as Count I), and then examine and apply the relevant tests used by both the Supreme Court and the Sixth Circuit for determining whether a (generally) private individual or entity is a state actor for the purposes of a Section 1983 claim. Finally, the Court will address Plaintiff's state-law claims in Count II and Count III.

### 1. Section 1983 and State Actors

A plaintiff bringing a Section 1983 claim must plead two things to state a claim: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) [that] the deprivation was caused by a person acting *under color of state law*." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) (citing *Simescu v. Emmet County Dept. of Social Servs.*, 942 F.2d 372,

374 (6th Cir. 1991)) (emphasis added). *See also Gmeiner v. Kent*, No. 1:25-CV-00502, 2025 WL 2848543 (W.D. Mich. Oct. 3, 2025) (Section 1983 requires "plaintiffs to allege two things at the pleading stage to state a claim. A plaintiff must first allege that they suffered a 'deprivation' of a constitutional right. And they must further allege that the defendant acted 'under color of' state law when inflicting this injury." (internal citations omitted)). It follows that a "plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the party's conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)). Instead, to state a Section 1983 claim, as noted above, "the plaintiff must sue a person or entity who may fairly be said to be acting under color of state law *or* as a state actor." *Norris v. Schauman*, No. 3:13-CV-00542, 2013 WL 3224346, at *3. (M.D. Tenn. June 25, 2013) (quotation marks omitted) (emphasis added). Still, "there are circumstances under which private persons may, by their actions, become 'state actors' for § 1983 purposes." *Tahfs*, 316 F.3d at 590.

One such circumstances is where the "conduct allegedly causing the deprivation of a federal right" is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). In *Lugar*, the Supreme Court recognized that its cases had generally adopted a "two-part approach" to the question of "fair attribution" of private conduct to the State. *Id*. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [S]tate or by a person for whom the State is responsible,"[15] and

---

[15] The phrasing here regarding causation—suggesting that it is not enough that there is a deprivation of a right, and that instead there must be a deprivation specifically "caused by" the exercise of some state-created right "or by" some state-created rule of conduct—strikes the Court as odd and somewhat difficult to parse. However the Supreme Court went on to further explain the first prong of *Lugar* by reframing the question it poses in terms of "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority." *Lugar*, 457 U.S. at 939. In other words, to satisfy the first

"[s]econd, the party charged with the deprivation must be a person who may fairly be said to be a state actor"—for instance "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*[16] *See also Kerns v. Chesapeake Exploration, L.L.C.*, 762 F. App'x 289, 294-95 (6th Cir. 2019) (explaining the two-part framework laid out in *Lugar* and then noting that the Sixth Circuit has "recognized several [other] tests to determine whether a defendant is a state actor."). On the other hand, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action" for purposes of a Section 1983 claim. *Kurita v. State Primary Bd. of Tennessee Democratic Party*, No. 3:08-0948, 2008 WL 4601574, at *7 (M.D. Tenn. Oct. 14, 2008) (quoting *Sullivan*, 526 U.S. at 52 (1999)), *aff'd*, 472 F. App'x 398 (6th Cir. 2012).

Beyond the framework elucidated in *Lugar*, the Sixth Circuit "has recognized as many as four tests to aid courts in determining whether challenged conduct is fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). "A plaintiff need only show state action under one of the tests in order to proceed with his claim." *C.S. Sewell, M.D. P.C. v. Amerigroup Tennessee, Inc.*, No. 2:17-CV-00062, 2018 WL 6591429, at *5 (M.D. Tenn. Dec. 14, 2018) (citing *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir.

---

prong of *Lugar,* it seems to Court that there must have been some conduct having its source in state authority that led to the deprivation of the right at issue.

[16] To the extent that the second prong of the *Lugar* approach invites courts to examine whether a private entity's conduct is "fairly chargeable to the State" it seems to beg the very question that *Lugar* is attempting to answer—i.e., whether a private entity's conduct is fairly attributable to the State. In the event, Plaintiff does not rely on the idea that the Defendants' conduct is "fairly chargeable" to the State as conceived of in the second prong of *Lugar*, choosing instead to argue that Defendants received *significant aid* from the State, and so the Court declines to examine in more detail how to apply this portion of *Lugar*'s second prong.

2007)). However, the application of the public function test (among other tests) [17] is relevant when analyzing "the conduct of a private entity . . . only in cases in which there are no allegations of cooperation or concerted action between state and private actors." *Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).[18]

As noted above, the question before the Court is whether Defendants were state actors for the purposes of Plaintiff's Section 1983 claims (Count I). Before proceeding to analyze this issue, the Court finds it helpful to explain a handful of analytical points that will underly its analysis below and to describe the frameworks on which Plaintiffs rely to argue that Defendants were acting as state actors for the purposes of a Section 1983 claim. The Court finds it important to do so

---

[17] As will become clear below, of the tests that the Sixth Circuit has endorsed, Plaintiff relies on just one: the public function test.

[18] This language is critical for another reason besides merely delineating the scenarios where courts may apply the public function test. *Sullivan* stated that an "[a]ction taken by private entities with the *mere approval or acquiescence* of the State is not state action." *Kurita*, 2008 WL 4601574, at *7 (quoting *Sullivan*, 526 U.S. at 52) (emphasis added). But the quoted language from the Sixth Circuit in *Am. Postal Workers Union, AFL-CIO* clearly suggests the opposite—that state action (for purposes of a Section 1983 claim) in some cases may be found even where the State is merely approving or acquiescing in private action. At first blush the language of the Sixth Circuit here may appear to be in direct contradiction to the statement from the Supreme Court in *Sullivan*, but the apparent conflict can be reconciled.
As this Court previously explained (and as will be explained in more detail below):

> To satisfy the "public function" test, the private entity must exercise "powers traditionally exclusively reserved to the State." *Jackson,* 419 U.S. at 352; *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 159, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). "This test is difficult to satisfy[,]" and is interpreted narrowly. *Durante v. Fairlane Town Ctr.,* 201 F. App'x 338, 341 (6th Cir. 2006). While many functions have been performed traditionally by governments, very few have been exclusively reserved to the State. *Id.*

*Kurita*, 2008 WL 4601574, at *7. In other words, the public function test asks whether the private entity is *exercising powers traditionally exclusively reserved to the State, i.e., taking on the role of the State.* To answer that question, it is simply irrelevant whether a private actor is *cooperating* with the State (which is enough to make the private actor a state actor) or whether instead the State was merely acquiescing in or approving the private actor's conduct (which is not enough). So in short, although action taken by private entities with the mere approval or acquiescence of the State (i) is not state action *merely because* the State approved or acquiesced in such action and (ii) is not state action under some of the recognized tests for state action, it nevertheless (iii) *can* be state action under the public function test (provided of course that the public function test is satisfied).

because of the myriad (and sometimes apparently conflicting) approaches courts utilize to determine whether private conduct is fairly attributable to the State. First, although Plaintiff refers in his Response to the public function test, the state compulsion test, and the nexus test noted above, Plaintiff actually seems to rely solely on the public function test to establish that Defendants were state actors for the purposes of his Section 1983 claims. (Doc. No. 109 at 4).[19] Second, Plaintiff also relies on the two-part framework explained in *Lugar* (which he invokes by quoting the Sixth Circuit's use of *Lugar* in *Tahfs* without citing *Lugar* directly), for determining when private conduct is fairly attributable to the State. (Doc. No. 109 at 2, 5).

As far as the Court can discern from the somewhat confusing case law analyzing the interplay of the various tests for determining when private conduct is fairly attributable to the State (so as to make the private actor a state actor for the purposes of a Section 1983 claim), Plaintiff's approach here—relying on *both* the two-part test from *Lugar* and the public function test—is permissible. As noted above, the Sixth Circuit has adopted various tests to assist district courts in determining whether private conduct is attributable to the State, but these tests do not actually seem to have *displaced* the two-part test elucidated by the Supreme Court in *Lugar* for determining whether private conduct is fairly attributable to the State. Rather, these other tests—i.e., the public function test, the state compulsion test, the nexus test, and the entwinement test—are only applied in limited circumstances where, as discussed above, "there are no allegations of cooperation or concerted action between state and private actors." *Am. Postal Workers Union, AFL-CIO*, 361 F.3d at 905. So, Plaintiff need prevail only under one of either the *Lugar* or public function tests to

---

[19] Indeed, Plaintiff merely mentions the state compulsion and nexus tests in passing (in the context of a quotation from the *Tahfs* case) and the public function test is the only of these three tests that Plaintiff engages in *any* analysis under. And so, the public function test will be the only one of these three tests that the Court will examine below. *Cf. Roe v. Lowe*, No. 3:24-CV-00368, 2024 WL 4778042, at *8 n.12 (M.D. Tenn. Nov. 13, 2024) ("Ultimately, it is not the Court's role to construct a plaintiff's legal arguments.").

show that Defendants were state actors for the purposes of a Section 1983 claim, and the Court will analyze Plaintiff's Complaint under both tests below.

## 2. The Lugar Test

As explained above, the Supreme Court recognized in *Lugar* that its cases have adopted a "two-part approach" to the question of "fair attribution" of private conduct to the State. *Lugar*, 457 U.S. at 937. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [S]tate or by a person for whom the State is responsible," and "[s]econd, the party charged with the deprivation must be a person who may fairly be said to be a state actor," for instance "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

The Court will begin and end its analysis with the second requirement of the *Lugar* test, because it is the only part of the *Lugar* test on which Plaintiff devotes *any* briefing.[20] Plaintiff argues that the allegations in the Complaint "are sufficient to plausibly demonstrate that the [Defendants] received 'significant aid from' the GPD in their efforts to suppress [Plaintiff's] First Amendment rights" (and thus are sufficient to satisfy the second of the requirements within the *Lugar* test discussed above). (Doc. No. 109 at 5). In support of this assertion, Plaintiff argues, variously, that (1) Plaintiff "credibly alleges the GPD leadership's longstanding belief that [Plaintiff] is insane and its previous disregard for [Plaintiff's] constitutional rights, which in and of itself sets out a plausible motive for the GPD to allow the [Defendants] to suppress [Plaintiff's] political speech" (Doc. No. 109 at 3) (citing Doc. No. 106 at ¶¶ 9-10); (2) a "reasonable inference

---

[20] Indeed, Plaintiff's failure to affirmatively argue that the first requirement of *Lugar* is satisfied here provides another reason to dispense with Plaintiff's argument that *Lugar* somehow shows that the Defendants were state actors.

[can be drawn] that [Defendant Pascal Jouvence's] status as a political candidate on the verge of winning the city alderman race would provide an additional incentive for the GPD leadership to favor the [Defendants] over the political protests of a noisy, longtime agitator whom the GPD leadership had long thought of as a 'crank'" (Doc. No. 109 at 3) (citing Doc. No. 106 at ¶¶ 43-45); and (3) Plaintiff "further bolsters the credibility of this particular inference with the fact that the [Defendants] apparently had a direct line of communication to the GPD Chief during the campaign, with the ability to call him on his cell phone at a moment's notice." (Doc. No. 109 at 3) (citing Doc. No. 106 at ¶¶ 34-37). Plaintiff also points to "specific incidents in which the GPD allowed the [Defendants] to act with impunity toward him," and points specifically to (1) the incident in August 2022 when "[Defendants] were able to take [Plaintiff's] political signs from right outside City Hall with impunity, disposing of them without interference from the GPD" (Doc. No. 109 at 3) (citing Doc. No. 106 at ¶¶ 16-18); (2) the incident at the Gallatin Fall Fest where Defendants took Plaintiff's signs (Doc. No. 109 at 3-4) (citing Doc. No. 106 at ¶¶ 19-23); and (3) the incidents on October 19, 2022 and October 31, 2022 (detailed above), in response to which the GPD "ultimately took no action against [Defendant Pascal Jouvence]." (Doc. No. 109 at 4) (citing Doc. No. 109 at ¶¶ 24-44).

Even though the Court takes these allegations as true for purposes of the instant Motion, Plaintiff's argument still fails for a simple reason: case law is clear (as noted in a footnote above) that an "[a]ction taken by private entities with the *mere approval or acquiescence* of the State is not state action," at least when applying the *Lugar* test. *Kurita*, 2008 WL 4601574, at *7 (quoting *Sullivan*, 526 U.S. at 52 (1999)) (emphasis added). *All* of Plaintiff's allegations with respect to the State, in this case the GPD, concern the *acquiescence or approval* of the GPD to Defendants' conduct. It is the failure of the GPD to prevent the Defendants' actions affirmatively, or to

otherwise to punish Defendants after the fact—in other words, the acquiescence or approval of the GPD to Defendants' conduct—that forms the basis of Plaintiff's Section 1983 claims in Count I, and indeed, forms the basis for Plaintiff's argument in his Response that Defendants were somehow state actors. There are no well-pled allegations *anywhere* in the Complaint that support the view that the GPD actually cooperated or took concerted action with Defendants,[21] let alone that the GPD actually provided *significant aid* to Defendants. In other words, the allegations in Plaintiff's Complaint have plainly failed to satisfy the second prong of the *Lugar* test, and Plaintiff has not plausibly suggested as required that Defendants therefore are state actors under the *Lugar* test.

### 3. Public Function Test

In his attempt to render Defendants state actors for purposes of Count I of the Complaint, Plaintiff invokes as an alternative to the *Lugar* test, the public function test. That is, Plaintiff argues alternatively that "the manner in which [Plaintiff's] signs were displayed should have been handled by the local government, not by [Defendants]," and that by "taking the law into their own hands with the apparent tacit blessing of the GPD, the [Defendants] performed a public function." (Doc. No. 109 at 4).

As noted above, the Sixth Circuit has held that the public function test, among others, is relevant only where "there are no allegations of cooperation or concerted action between state and

---

[21] Indeed, although Plaintiff's allegations contain a single characterization of the relationship between the GPD and Defendants as one of "cooperation," (Doc. No. 106 at ¶ 48), all of Plaintiff's allegations make clear that this "cooperation" is simply GPD's "acquiescence in or approval of" Defendants' conduct— something that, as repeatedly noted herein, cannot and does not support a finding that Defendants were acting as state actors under the *Lugar* test for the purposes of Plaintiff's Section 1983 claims.

private actors." *Am. Postal Workers Union, AFL-CIO*, 361 F.3d at 905.[22] It appears to the Court that the public function test is applicable (not to say *satisfied*) in this action because, as noted just above, the Complaint sets forth no allegations of cooperation or concerted action between the State (in the form of the GPD) and Defendants. Satisfied that the public function test is at least applicable to this action—such that the Complaint *potentially* could survive by virtue of that particular test— the Court first will review the public function test below, and then will apply it to the instant case to determine whether its outcome shows that Defendants were state actors for the purposes of a Section 1983 claim.

To satisfy the public function test, "the private entity must exercise 'powers traditionally exclusively reserved to the State.'" *Kurita*, 2008 WL 4601574, at *7 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). "This test is difficult to satisfy" because "'[w]hile many functions have been *traditionally* performed by governments, very few have been *exclusively* reserved to the State.'" *Durante v. Fairlane Town Center*, 201 F. App'x 338, 341 (6th Cir. 2006) (quoting *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1456 (10th Cir.1995)). As the Sixth Circuit has explained, the "public function test has been interpreted narrowly," and "[o]nly functions like holding elections, exercising eminent domain, and operating a company-owned town fall under this category of state action." *Chapman v. Higbee Co.*, 319 F.3d 825, 833-34 (6th Cir. 2003) (internal citations omitted). Importantly, for this analysis, the Court must conduct "a historical analysis to determine whether the party has engaged in an action traditionally reserved to the [S]tate, and *the plaintiff bears the burden of making that showing*." *Wittstock v. Mark A. Van Sile, Inc.,* 330 F.3d 899, 902 (6th Cir. 2003) (citing *Tahfs*, 316 F.3d at 593) (emphasis added). *See*

---

[22] For the reasons explained more fully in the footnote above, the Court can discern no fault in examining the public function test in this action even though it has already concluded above that the actions taken by Defendants were carried out with nothing more than the "approval or acquiescence" of the GPD.

*also Marie*, 771 F.3d at 362-63 ("simply alleging in a complaint that [a private actor] is a state actor or that [certain conduct] is traditionally exclusively in the province of the State is no longer, if it ever was, sufficient to survive a motion to dismiss. . . . [The plaintiffs] fail to provide any historical argument or analysis that [the conduct at issue] is traditionally exclusively a state function. Considering that plaintiff bears the burden on this issue, this failure alone renders this test inapplicable." (internal citations omitted) (internal quotation marks omitted)). That a plaintiff bears the burden under this test is crucial, and the Sixth Circuit has found that where a plaintiff has failed "to provide any historical argument or analysis," the public function test is "inapplicable." *Tahfs*, 316 F.3d at 593 (quoting *Ellison*, 48 F.3d at 196).

Here, Plaintiff has plainly not met his burden of alleging facts that plausibly suggest that Defendants were engaged in conduct traditionally reserved exclusively to the State. Indeed, Plaintiff's argument that the public function test applies is limited to a single paragraph in his Response:

> Moreover, while the criminal assault [Defendant Pascal Jouvence] committed against [Plaintiff] on October 31, 2022 is obviously not a "public function," the enforcement of Gallatin's political sign ordinances is. (Ex. A [(Doc. No. 109-1)], Gallatin Sign Ordinance ) (conveying authority to remove signs to the "Zoning Administrator or designee"). Thus, whatever complaints the [Defendants] may have had about the manner in which [Plaintiff's] signs were displayed should have been handled by the local government, not by them. By taking the law into their own hands with the apparent tacit blessing of the GPD, the [Defendants] performed a public function.

(Doc. No. 109 at 4). In arguing that Defendants performed a public function in removing Plaintiff's signs, Plaintiff relies on the city of Gallatin's political sign ordinance. That ordinance (Doc. No.

109-1)[23] assigns authority to "the Zoning Administrator or designee . . . to remove or order the removal of any sign" placed in certain locations. (Doc. No. 109-1 at 1).

Plaintiff's reliance on a city ordinance, however, is misplaced and misses the thrust of the public function test. It matters not whether a particular function is *now* assigned to the State (or subdivision of the State,[24] in this instance, the municipality of Gallatin, Tennessee)[25] Rather, as noted above, the relevant inquiry is whether Defendants were exercising powers "*traditionally exclusively* reserved to the [S]tate," and Plaintiff bears the burden to show—by putting forward "historical argument or analysis"—that these powers were traditionally reserved exclusively to the State. *Tahfs*, 316 F.3d at 593. *See also Wittstock*, 330 F.3d at 902 ("a historical analysis to determine whether the party has engaged in an action traditionally reserved to the [S]tate, and *the plaintiff bears the burden of making that showing*." (emphasis added)). Plaintiff, who merely references a contemporary municipal ordinance in his Response,[26] has plainly not met this burden.

---

[23] A copy of the Gallatin political sign ordinance was filed as an attachment to Plaintiff's Response at Docket No. 109-1.

[24] In Tennessee, a municipality is considered a subdivision of the State. *See, e.g., Clark v. Vaughn*, 177 Tenn. 76, 146 S.W.2d 351, 352 (1941) (referring to "municipalities, as well as other subdivisions and arms of the State government"); *State v. Eayrs*, No. E201402072CCAR3CD, 2015 WL 9311865, at *8 (Tenn. Crim. App. Dec. 22, 2015) (quoting Tenn. R. Evid. 202(b)(3)).

[25] The Court notes that for the purposes of whether a function is a "public function" traditionally exclusively reserved to the State, courts also consider whether a particular function was traditionally exclusively carried out by *municipalities* (as opposed to limiting their analyses to whether a particular function was traditionally exclusively reserved to state governments). *See e.g., Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1114 (6th Cir. 1981) (applying the public function test and noting that "[m]any functions have been traditionally performed by governments, but few have been exclusively reserved to the states, such as conducting elections and providing all the municipal services of a town."); *Wright v. Richardson*, 740 F. Supp. 3d 601 (E.D. Mich. 2024) ("The public-function test applies when a private entity performs a function that is traditionally and exclusively reserved to the state, such as running elections or operating a municipality." (citing *Ellison*, 48 F.3d at 195))), *aff'd*, No. 24-1679, 2025 WL 2381708 (6th Cir. Apr. 14, 2025).

[26] Indeed, Plaintiff's failure to make any mention of this ordinance (or conduct any sort of historical analysis) in his Complaint is yet another reason why Plaintiff's public function argument is unavailing. *Marie*, 771 F.3d at 362 (finding that the burden is "on the [plaintiffs] *to advance historical and factual*

Accordingly, Plaintiff has failed to plausibly suggest as required that the public function test is satisfied here so as to afford the Defendants state actor status (at least at the motion-to-dismiss stage) for purposes of a Section 1983 claim. *See Tahfs*, 316 F.3d at 593 (finding that where a plaintiff has failed to put forward any historical argument or analysis to show that defendants' conduct was traditionally exclusively reserved to the State, that failure renders the public function test inapplicable). For this reason, and because (as discussed above), Plaintiff also has failed to plausibly suggest that Defendants are state actors under *Lugar*, Count I of Plaintiff's Complaint must be dismissed with prejudice.

### 4. *Plaintiff's State-Law Claims: Counts II and Count III*

That leaves Plaintiff's state-law claims in Count II and Count III remaining before the Court. As noted in a footnote above, Plaintiff does not allege in the Complaint how the Court may exercise jurisdiction over his state claw claims in Count II and Count III of the Complaint. Rather, Plaintiff merely states that the "Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331." (Doc. No. 106 at ¶ 5). The Court assumes that Plaintiff intended for the Court to exercise jurisdiction over these state-law claims via supplemental jurisdiction under 28 U.S.C. § 1367,[27] as all parties appear to be residents of Tennessee, and thus diversity jurisdiction would not be a proper basis for the Court to exercise jurisdiction over these

---

*allegations in their complaint* giving rise a reasonable inference that [certain functions are] traditionally exclusively in the province of the State. (emphasis added)). This is especially true here because Plaintiff identifies no case law, and the Court could locate none, holding that "sign removal" was somehow traditionally exclusively reserved to the State. *See Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 141 n.1 (6th Cir. 2023) (interpreting *Marie* to require a "plaintiff to allege [in its complaint] the historical basis" for the public function test where previous judicial precedent is not clear that a particular function is traditionally exclusively in the province of the State).

[27] That statute provides in relevant part that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," and that where, as here, "the district court has dismissed all claims over which it has original jurisdiction," then a district court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(a), (c)(3).

state-law claims. The Court does not dispute that supplemental jurisdiction over the state-law claims in Count II and Count III would be proper if Plaintiff's federal claims in Count I were to survive the instant Motion. However, now that the Court has determined that Plaintiff's federal claims in Count I will be dismissed, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state-law claims in Count II and Count III, will dismiss these claims without prejudice, and will thus dismiss this entire action in an accompanying order. *See e.g., Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

CONCLUSION[28]

Accordingly, for the reasons described herein, the Motion (Doc. No. 107) will be **GRANTED**, and the Complaint (Doc. No. 106) will be dismissed in its entirety.

An appropriate accompanying order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[28] Plaintiff also asserts that Defendants' arguments in its Motion and Opening Brief "are better suited to Rule 56 or trial." (Doc. No. 109 at 5). At base, Plaintiff's argument is that "Plaintiff is not required to conclusively prove his case in order to overcome Rule 12 and is entitled to 'all reasonable inferences' in his favor." (*Id.* at 5) (quoting *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396) (6th Cir. 2016)). This proposition is true enough, but does nothing to avail Plaintiff, because even taking all the well-pled factual allegations in the Complaint as true, the Court cannot find that Plaintiff has plausibly suggested that Defendants were state actors under any of the tests that he invokes in an effort to sustain his Section 1983 claims in Count I.